JULIE PAQUIN; and
SCOTT HAEBERLIN,

     Plaintiffs,

v.

CITY OF ATLANTA; and
KEYETTA HOLMES,

     Defendants.

CIVIL ACTION NO.
1:21-cv-01073-ELR-RDC

## ORDER AND FINAL REPORT AND RECOMMENDATION

This is an employment-discrimination case. Plaintiffs Julie Paquin and Scott Haeberlin have sued their former employer, the City of Atlanta, and supervisor, Keyetta Holmes, alleging unlawful discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); and 42 U.S.C. § 1983 ("Section 1983"). The following motions are currently pending before the Court in this matter: (1) Defendants' Motion to Strike, (Doc. 17); (2) Defendants' separate Motions to Dismiss, (Docs. 10, 11); and (3) Plaintiffs' Motion to Amend, (Doc. 20).

For the reasons below, the undersigned **ORDERS** that Defendants' Motion to Strike be **GRANTED**; **RECOMMENDS** that Defendants' separate Motions to Dismiss each be **GRANTED;** and **RECOMMENDS** that Plaintiffs' Motion to Amend be **DENIED** as futile.

# I. BACKGROUND

## A. Factual Background

This case concerns the workplace conditions and termination of two former City employees. The following facts are taken from Plaintiffs' First Amended Complaint, (Doc. 6 ["FAC"]), the operative pleading in this case, and construed in Plaintiffs' favor for present purposes.[1]

Paquin, a white female, began working in October 2017 as a Senior Plan Review Specialist in the City's Office of Zoning and Development ("OZD"), a unit within the Department of City Planning ("Department"). (FAC ¶ 7). Haeberlin, a gay white male, began working in the City's Office of Buildings in July 2014 but was later transferred to the OZD, where he also served as a Senior Plan Review Specialist. (*Id.* ¶ 14). Following his transfer, Haeberlin was directly supervised for a period by Tamaria Letang, a black female. (*Id.*). On September 11, 2019, both Paquin and Haeberlin were discharged by Defendant Holmes, a black female, who was the OZD Director. (*Id.* ¶¶ 11, 24).

Paquin and Haeberlin allege that, as the only white Senior Plan Review Specialists at the OZD during their tenures, they were the victims of unlawful discrimination and/or retaliation leading up to and including their terminations. *See*

---

[1] In evaluating a motion to dismiss, the Court "accept[s] the allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiff." *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

(*id.* ¶¶ 10–11, 15, 18, 20–24). According to Plaintiffs, the OZD was rife with open hostility toward whites, gays, and Catholics. *See* (*id.* ¶¶ 9–10, 17–18, 20–21). The lead actors in fostering the OZD's discriminatory environment were Letang and another black female supervisor, Nicole Mitchell, each of whom, according to Plaintiffs, regularly expressed support for "Black women in power," the "Black Mayor of Atlanta," and "Black girl power," while also openly voicing a preference for black employees. (*Id.* ¶¶ 9–10, 17–18, 20–21, 28–29). Plaintiffs further allege that "[m]ost" employees in the Department were black, and "many" of the black female employees were alumnae of the same sorority. (*Id.* ¶ 19). Several of those same black employees, including Letang, also attended the same Baptist church. (*Id.*).

In support of her claims, Paquin further alleges that Letang called her "Barbie" and described her as "prissy," while other coworkers sometimes referred to her as the "little White girl" in front of Letang and Mitchell. (*Id.* ¶ 10). On multiple occasions, Letang encouraged Paquin to date black men. (*Id.*).

Haeberlin's allegations are lengthier. He alleges that Letang, believing that he belonged to the Republic party, often "screamed and ranted" at him and others about President Donald Trump's lack of support for the Black Lives Matter movement. (*Id.* ¶ 18). Letang also knew that Haeberlin was Catholic, and several times she openly declared that "Catholics think they are in a religion, but they are not." (*Id.*

¶ 20). On another occasion, Letang made a "limp wrist" gesture toward Haeberlin, apparently as a derogatory reference to his sexual orientation. (*Id.* ¶ 21). At some point, Haeberlin was informed—whether by Letang or others, it is not clear—that he had not been further promoted because he "could not get along with Black people." (*Id.* ¶ 25). Haeberlin made multiple complaints to the City's Human Resources Department about Letang's conduct, but to his knowledge, the City took no corrective action. (*Id.* ¶ 22). He was, however, eventually re-assigned to a different OZD supervisor. (*Id.*). Finally, Haeberlin alleges that, in his role as Senior Plan Review Specialist, his annual salary was $2,000.00 less than at least two of his "peers," despite the fact that he had "more experience and more education than many or most" other employees with "identical job titles and descriptions." (*Id.* ¶ 23, 48).

As already described, Paquin and Haeberlin were both eventually discharged by Defendant Holmes on September 11, 2019. (*Id.* ¶¶ 11, 24). Those terminations were made, in each case, "without cause." (*Id.*). This came as a surprise to Paquin and Haeberlin, as neither had a disciplinary history while, according to them, other black employees had been disciplined without termination in the past. (*Id.* ¶¶ 8, 11–12, 16, 24, 31, 41). Upon information and belief, Paquin and Haeberlin allege that they were each replaced by black females. (*Id.* ¶¶ 13, 26).

### B. Procedural Background

Plaintiffs filed their original Complaint on March 16, 2021. (Doc. 1). Three

days later, they filed their FAC as a matter of course "for the sole purpose of redacting personal identifiers" from their respective EEOC charges attached to the original Complaint. (FAC at 1).

On July 19, 2021, Defendants timely filed separate Motions to Dismiss the FAC pursuant to Rule 12(b)(6) for failure to state a claim. (Docs. 10, 11). In response, Plaintiffs filed another amended pleading without Defendants' consent or this Court's leave. (Doc. 15). Defendants promptly moved to strike that document as improperly filed, which Plaintiffs do not oppose. (Doc. 17). As a preliminary matter, because Plaintiffs improperly filed their second amended pleading, Defendants' Motion to Strike, (Doc. 17), is **GRANTED**, and the Clerk is **DIRECTED** to strike Doc. 15 from the docket.

Moving on, Plaintiffs oppose Defendants' Motions to Dismiss, *see* (Doc. 16), and they have also moved to correct their earlier omission by seeking this Court's leave to file a proposed Second Amended Complaint, (Docs. 20, 20-1 ["SAC"]). These matters are now ripe for review.

## II. LEGAL STANDARDS

### A. Motion to Dismiss

When evaluating a motion to dismiss, the reviewing court looks to see whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The touchstone is plausibility rather than mere possibility. *Id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). And a claim's plausibility must be buoyed by facts over fancy. *Id.* (explaining that a complaint must include more than "an unadorned, the-defendant-unlawfully-harmed-me accusation"). That means "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In other words, the plaintiff's allegations must sketch an actual (*i.e.*, factual)—not just hypothetical—claim. *Id.* ("[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" (citation omitted)).

Moreover, the pleaded facts themselves must be more than just consistent with an entitlement to relief—they must reasonably suggest as much. *Twombly*, 550 U.S. at 557 (underscoring "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" the plaintiff's entitlement to relief). Ultimately, the pleading standard requires the plaintiff to allege sufficient facts to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As relevant here, in the employment context, a plaintiff need not allege the same measure of facts necessary to make out a prima facie case, but she must nevertheless include sufficient factual allegations

6

to plausibly suggest an adverse employment action took place due to an unlawful motive. *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015).

### B. Motion to Amend

A party may amend its pleading once as a matter of course within 21 days of serving it. Fed. R. Civ. P. 15(a)(1)(A). However, after this first amendment, unless otherwise specified, a party may amend its pleading "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). In general, leave to amend should be freely given "when justice so requires." *See id.* But leave need not be given "when the amendment would prejudice the defendant, follows undue delays, or is futile." *Campbell v. Emory Clinic*, 166 F.3d 1157, 1162 (11th Cir. 1999). Amendment is futile where the amended complaint would still be subject to dismissal. *See E.E.O.C. v. STME, LLC*, 938 F.3d 1305, 1320 (11th Cir. 2019). A district court has "extensive discretion" under Rule 15(a) in deciding whether to grant a motion for leave to amend. *Campbell*, 166 F.3d at 1162.

### III. DISCUSSION

Paquin and Haeberlin each assert claims of race[2] discrimination against the

---

[2] Plaintiffs also nominally assert discrimination claims on the basis of "color" under Title VII. *See* (FAC Count I). "Race" and "color" are not synonymous under that statute. *See Walker v. Sec'y of Treasury, I.R.S.*, 713 F. Supp. 403, 406 (N.D. Ga. 1989); *Gill v. Bank of Am. Corp.*, No. 2:15-cv-319-FtM-38CM, 2015 WL 4349935, at *4 (M.D. Fla. July 14, 2015). Here, the substance of Plaintiffs' allegations plainly concerns race rather than color; therefore, insofar as Plaintiffs assert separate claims of color discrimination under Title VII, the undersigned **RECOMMENDS** that such claims be **DISMISSED**.

City under Title VII (Count I), and related claims against both the City and Holmes under Section 1983 (Counts IV and V). (FAC ¶¶ 27–36, 55–64). Haeberlin also asserts several additional claims against the City—namely, (i) sex discrimination (Count I) and (ii) religious discrimination and retaliation (Count II), under Title VII; and (iii) sex-based wage discrimination (Count III), under the EPA. (*Id.* ¶¶ 27–54). Paquin's claims are predicated on her termination, while Haeberlin's claims are rooted in his termination and alleged pay disparity.[3]

Before turning to the merits of Plaintiffs' claims as pleaded, the undersigned pauses a moment to note that, based on their failure to meaningfully respond to Defendants' respective Motions to Dismiss, Plaintiffs might be deemed to have

---

[3] The undersigned has tried to do justice by Plaintiffs in construing the FAC in their favor, *see* Fed. R. Civ. P. 8(e), and in doing so it appears that the above-cited grounds form the bases of Plaintiffs' claims. That said, disparate treatment claims premised upon failure to promote, *see* (FAC ¶¶ 25, 63), or hostile work environment, *see* (*id.* ¶¶ 10, 18, 20–21), could conceivably be read into the FAC on a very generous construction. But Plaintiffs do not argue such claims in opposition to dismissal, *see* (Doc. 16), so they have been abandoned in any case. *See McMaster v. United States*, 177 F.3d 936, 940–41 (11th Cir.1999) (noting that a claim may be considered abandoned when the allegation is included in the plaintiff's complaint, but he fails to present any argument concerning this claim to the district court). Separately, such claims would nevertheless fail as inadequately pleaded. To state claim for failure to promote, a plaintiff generally must allege that she applied for a position or that doing so would have been futile. *See Giles v. BellSouth Telecomm., Inc.*, 542 F. App'x 756, 760–61 (11th Cir. 2013). To state a claim for hostile work environment, a plaintiff must allege facts suggesting "that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Henderson v. City of Birmingham*, 826 F. App'x 736, 743 (11th Cir. 2020) (quotation and citation omitted). Plaintiffs have done neither of these things. Plaintiffs' passing references to failed promotions are conclusory, and the allegations regarding their workplace environment lack the objective severity or performance interference necessary to sustain a claim. *See id.* Accordingly, insofar as Plaintiffs assert claims for failure to promote or hostile work environment under Title VII, the undersigned **RECOMMENDS** that such claims be **DISMISSED**.

abandoned their claims altogether. Their opposition to dismissal is wholly perfunctory—they do not cite a single case to support their positions, but instead point to their allegations and repeatedly quip that "nothing more is required." *See* (Doc. 16 at 6–9). To illustrate, in response to Defendants' argument that their Section 1983 claims against the City should be dismissed, Plaintiffs simply state: "Plaintiffs properly set out their official capacity claims in Count IV, paragraphs 57–76, and 77–80. Nothing more is required at the pleading stage." (*Id.* at 9). That's it. But argument, not *ipse dixit*, is required to properly sustain a claim under challenge. And it is not this Court's role to supply such argument. *See Williams v. Hous. Auth. of Savannah, Inc.*, 834 F. App'x 482, 489 (11th Cir. 2020); *accord Mamon v. Midland Funding, LLC*, No. 1:13-CV-2301-AT-GGB, 2013 WL 12382685, at *4 (N.D. Ga. Nov. 14, 2013) (noting that a plaintiff's response brief, which quoted excerpts from a treatise and maintained that a claim was adequately pled but "otherwise failed to address in any meaningful way the arguments" presented by the defendant, amounted to abandonment of the issue).

Having said that, the undersigned is reluctant to foreclose review of Plaintiffs' claims based on briefing deficiencies alone. So, turning to the merits, the following discussion is organized around the statutes at issue—that is, Title VII, the EPA, and Section 1983—with Plaintiffs' respective claims reviewed thereunder. And because Plaintiffs not only oppose dismissal but have also moved to amend the FAC, the

following discussion addresses both the FAC and the proposed SAC, as appropriate, to assess the profit or futility of amendment. *See STME, LLC*, 938 F.3d at 1320.

### A. Title VII (Counts I & II)

First up are Plaintiffs' Title VII claims. Title VII makes it unlawful for an employer to discriminate against an employee because of, among other things, the employee's "race, . . . religion, [or] sex." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has clarified that "sex" discrimination as prohibited under Title VII includes discrimination based on sexual orientation. *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1743 (2020). A plaintiff raising a discrimination claim under Title VII may be entitled to relief if she shows that an illegal bias "was a motivating factor" for an adverse employment action, even if other factors also motivated the employer's decision. 42 U.S.C. § 2000e-2(m); *see also Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1274 n.3 (11th Cir. 2021). Title VII separately prohibits an employer from retaliating against an employee because the employee opposed "an unlawful employment practice." 42 U.S.C. § 2000e-3(a). Notably, unlike discrimination claims, Title VII retaliation claims require a plaintiff to show that a retaliatory motive was the but-for cause of the challenged employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

### i. Paquin's Claim

Paquin claims that she was discharged because of her race. Her allegations are

sewn together as follows. She purports to establish a racially discriminatory animus based principally on allegations concerning Letang and Mitchell, two black OZD supervisors in an office comprised mostly of black employees, many of whom socialized together. According to Paquin, these two individuals openly supported black causes, expressed a preference for black employees, and made disparaging and racially motivated comments to her. Paquin then imputes Letang and Mitchell's alleged discriminatory animus to Defendant Holmes, the black female OZD Director, who fired her "without cause" notwithstanding an exemplary work history. In support of its Motion to Dismiss, the City maintains that Paquin's allegations reference only stray remarks by non-decisionmakers, and for that reason, do not state a claim for relief. The City also contends that amendment would be futile.

After careful review, the undersigned concludes that Paquin's allegations do not plausibly support an inference of intentional racial discrimination. To start, while crediting the FAC's allegations as true, it means very little that most employees in the Department were black, that many were also alumnae of the same sorority and attended the same church, or that Letang and Mitchell supported black causes. These bald facts are inert. Ill will and resentment—whether at the office or elsewhere—do not simply emerge from demographic numbers alone. It would be wrong to presume as much. Further, as a general matter, it would also be wrong to presuppose, as Paquin's claim seems to do, that race relations must be zero-sum—or, to put it

another way, that *intra*-racial fellowship is only leveraged through forced *inter*-racial exclusion. Congregation need not entail discrimination. That said, based on voiced hiring preferences and comments directed at her, Paquin's allegations do suggest that Letang and Mitchell harbored some measure of racially discriminatory animus toward whites. But to sound a theme that will be echoed throughout this discussion, the FAC is empty of any allegations to plausibly impute that animus to Holmes, who made the final termination decision. *See Walker v. Prudential Prop. and Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) ("When evaluating a charge of employment discrimination . . . we must focus on the actual knowledge and actions of the decision-maker."); *Steger v. General Electric Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) (explaining that "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process" do not demonstrate discriminatory intent); *Holifield v. Reno*, 115 F.3d 1555, 1563–64 (11th Cir. 1997) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.") (quotation and citation omitted), *abrogated on other grounds by Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019).

To move forward with her claim, Paquin must allege sufficient facts to plausibly suggest an adverse employment action took place due to an unlawful motive. *See Surtain*, 789 F.3d at 1246. She hasn't done so. There are three

individuals central to Paquin's claim. She points to two of them to show motive (*i.e.*, Letang and Mitchell), and to the third who took action (*i.e.*, Holmes). The fatal flaw is that she points to no relevant link between them—whether in the form of sympathy or influence. In other words, the FAC includes no allegation that Holmes shared Letang and Mitchell's discriminatory attitude toward whites, nor is there any hint that Letang and Mitchell were involved in or otherwise had any influence on Holmes's decision to terminate Paquin. *See Walker*, 286 F.3d at 1274; *Steger*, 318 F.3d at 1079; *Holifield*, 115 F.3d at 1563–64. For example, there are no factual allegations in the FAC that Letang and Mitchell participated in the termination decision, recommended the termination decision, attended staffing meetings with Holmes, or otherwise discussed personnel matters with her so as to have some impact on the final decision. Plaintiffs do not even allege that either was supervised by Letang or Mitchell at the time they were fired. Instead, the only factual sinew connecting these central figures is that they are all black. That is not enough. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . ."); *see also Henny v. New York State*, 842 F. Supp. 2d 530, 557 (S.D.N.Y. 2012) ("Plaintiff's sole reliance on the mere fact that [his supervisor and coworker] had a common ethnicity is insufficient" to support an inference of discriminatory preference.).

The other circumstances Paquin alleges in the FAC—namely, that other black

employees were disciplined but not fired, and that she was replaced by a black employee—are not enough to push her claim across "the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. To repeat, the focus of the present inquiry is on Holmes's intent and whether Paquin has put forth sufficient allegations to suggest that Holmes was motivated, at least in part, by discriminatory reasons. *See Walker*, 286 F.3d at 1274. Relevant to that inquiry would be facts showing that Holmes treated other similarly situated individuals differently. *See Lewis*, 918 F.3d at 1222–23. Paquin alleges no such facts in the FAC. In an apparent effort to remedy this defect, she asserts in the SAC that other black employees who "were similarly situated in all material respects" were treated differently, *see* (SAC ¶¶ 12, 24, 31), but that conclusory declaration is without any factual enhancement. She does not say how and in what respects she and these other unidentified comparators were similar, nor, importantly, does she say that Holmes was responsible for their disparate treatment. And while Paquin alleges that she was replaced by a black employee, she does not even allege who made the hiring decision.

All told, Paquin's allegations are consistent with racial discrimination but they do not reasonably suggest it. The main reason—Holmes made the termination decision, but Paquin has failed to assert sufficient factual allegations suggesting that Holmes's decision was in any way motivated by race. *See Walker*, 286 F.3d at 1274; *Steger*, 318 F.3d at 1079; *Holifield*, 115 F.3d at 1563–64. Paquin was fired without

cause, and she may understandably be confused and personally offended. But even if not advisable, an employer "may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, *as long as its action is not for [an unlawful] reason.*" *Gogel v. Kia Motors Manuf. of Ga., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (emphasis added) (quotation and citation omitted); *see also Melvin v. Fed. Express Corp.*, 814 F. App'x 506, 514 (11th Cir. 2020) ("Our concern is whether an employment decision was motivated by unlawful discriminatory animus, not whether the decision was prudent or fair."). Paquin's allegations do not plausibly suggest otherwise. While certain members of the OZD may have harbored a racial bias, "[d]iscrimination in the air, so to speak, will not do." *Chuang v. T.W. Wang Inc.*, 647 F. Supp. 2d 221, 230 (E.D.N.Y. 2009). Critically, Paquin has not tied together the sentiments of Letang and Mitchell, on the one hand, and Holmes's termination decision, on the other. Moreover, the other circumstantial markers alleged do not suggest that Holmes acted unlawfully. Paquin's comparator allegation is conclusory and devoid of meaningful content, while the race of her replacement means little absent any facts concerning the persons or process involved in such hire.

For these reasons, the undersigned concludes that Paquin has failed to state a claim of race discrimination under Title VII in the FAC. Moreover, review of the proposed SAC reveals the same deficiencies. Accordingly, the undersigned **RECOMMENDS** that Paquin's Title VII claim be **DISMISSED**, and that

Plaintiffs' Motion to Amend be **DENIED** as futile with respect to such claim.

### ii. Haeberlin's Claims

Next, Haeberlin likewise claims that he was wrongfully discharged because of his race, but he further maintains, additionally or alternatively, that he was fired because of his sex and/or religion. His racial discrimination allegations are largely redundant with Paquin's, although he adds that he was once told by supervisors that he was not promoted because "he could not get along with Black people." (FAC ¶ 25). Regarding his claim of sex discrimination, Haeberlin cites Letang's derogatory "limp wrist" gesture as demonstrative of an unlawful animus. As for his religion-based claims, he alleges both discrimination and retaliation predicated on Letang's disparagement of Catholics and his corresponding complaints about her behavior, respectively. In opposition, the City insists, as it does with Paquin, that the allegations in the FAC do not plausibly suggest that Holmes was motivated by discriminatory motives. Moreover, the City continues, Haeberlin has insufficiently pled the requisite causal link between his complaints and termination needed to support a retaliation claim. The City again argues that amendment would be futile.

In large part for reasons already discussed above, Haeberlin's discrimination and retaliation claims also fail. First, Because Haeberlin's racial discrimination allegations are nearly identical to Paquin's, the same analysis may be carried forward. In short, Haeberlin, like Paquin, has failed to include sufficient factual

allegations suggesting that Holmes, who made the termination decision, was motivated by a racially discriminatory animus. *See Walker*, 286 F.3d at 1274; *Steger*, 318 F.3d at 1079; *Holifield*, 115 F.3d at 1563–64. Haeberlin's additional allegation that he lost out on promotions because he "could not get along with Black people" does not change the calculus. Importantly, Haeberlin does not allege who made the statement—whether Holmes or someone else. But as alluded to above, the key question is whether Haeberlin has put forward sufficient facts to reasonably suggest that Holmes fired him because of his race. *See Walker*, 286 F.3d at 1274; *Steger*, 318 F.3d at 1079; *Holifield*, 115 F.3d at 1563–64. The undersigned concludes that a single unattributed, ambiguous statement that does not directly concern his race (rather his ability to "get along" with others) or termination, even when considered with the remainder of his allegations, does not render Haeberlin's racial discrimination claim plausible. *See Steger*, 318 F.3d at 1079 (explaining that "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process," do not demonstrate discriminatory intent).

Next, Haeberlin's sex and religion-based claims rest on even thinner factual grounds, and they too fall short for principally the same reason. His sex-based discrimination claim leans solely on a single derogatory gesture allegedly made by Letang—*i.e.*, *not* Holmes. Similar can be said of Haeberlin's religion-based discrimination claim, which is also predicated only on Letang's conduct. To

underscore once again, even accepting as true that Letang publicly and inappropriately disparaged his sexuality and religious beliefs, it does not reasonably follow from that alone that Holmes—the decisionmaker about whom Haeberlin has made no independent allegations—fired him for those reasons. *See Walker*, 286 F.3d at 1274; *Steger*, 318 F.3d at 1079; *Holifield*, 115 F.3d at 1563–64. Finally, regarding Haeberlin's religion-based retaliation claim, he has failed to allege that Holmes knew about his complaints. As a general rule, a plaintiff must show that the decisionmaker was actually aware of the protected activity at the time she took the adverse employment action. *See Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020). But Haeberlin's allegations are silent on this point. Moreover, Haeberlin does not allege any other facts—*e.g.*, when the complaints were made and their temporal proximity to his termination—suggesting that his termination was causally related to his complaints.

Accordingly, the undersigned concludes that Haeberlin has also failed to state a claim under Title VII in the FAC. Moreover, because the proposed SAC does not correct the noted shortcomings, the undersigned **RECOMMENDS** that Haeberlin's Title VII claims be **DISMISSED**, and that Plaintiffs' Motion to Amend be **DENIED** as futile with respect to such claims.

### B. EPA (Count III)

Turning next to Haeberlin's disparate-pay claim, the EPA prohibits wage

discrimination on the basis of sex.[4] 29 U.S.C. § 206(d)(1). To state a claim under the EPA, a plaintiff must allege that (1) he or she was paid less than employees of the opposite sex, (2) the work performed by each required equal skill, effort, and responsibility, and (3) the work was performed under similar working conditions. *See Steger*, 318 F.3d at 1078; *Arafat v. Sch. Bd. of Broward Cnty.*, 549 F. App'x 872, 875 (11th Cir. 2013). With respect to the work performed, a plaintiff need only show that the jobs at issue are substantially equal. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992). However, "the standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high." *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 592 (11th Cir. 1994) (quotation and citation omitted). The key feature to consider is job content—that is, "the actual duties the respective employees are called upon to perform." *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989) (quotation and citation omitted). Moreover, what matters are the skills and qualifications actually needed to perform the jobs under consideration, not the skills and qualifications of the employees holding those jobs. *Mulhall*, 19 F.3d at 592.

Haeberlin has not sufficiently alleged the requisite job similarity to state an EPA claim. According to him, he was paid $2,000.00 less than some of his female

---

[4] Haeberlin does not plead wage-discrimination under Title VII, *see* (FAC Count I (addressing alleged hiring preferences and termination)), nor does he argue as much in response to Defendants' Motions to Dismiss, *see* (Doc. 16).

peers, with whom he shared "identical job titles and descriptions." (FAC ¶¶ 23, 48).

And he further alleges that he "had more experience and more education than many

or most" of them. (*Id.*). Conspicuously absent, however, are any allegations

regarding "the actual duties" that he and his comparators were required to perform.

*See Waters*, 874 F.2d at 799; *Arafat*, 549 F. App'x at 875. Missing are any facts

regarding the "skill, effort, and responsibility" of his job or the jobs of his

comparators. *See Arafat*, 549 F. App'x at 875. For example, the FAC does not speak

to requisite skills, primary job responsibilities, reporting and management

requirements, travel obligations, hours worked, etc., or any other relevant job criteria

to draw the needed analogy. *See id.* (affirming dismissal of plaintiff's EPA claim

because "[s]he did not plead the facts comparing her skill, effort, and responsibility

levels to those younger males who were allegedly paid more than her"). Although

Haeberlin states that he and his comparators shared "identical job titles and

descriptions," (FAC ¶ 48), this fact alone is not enough to reasonably suggest the

necessary measure of job similarity. *See Mulhall*, 19 F.3d at 592 ("Job titles are a

factor for consideration, but are not dispositive."); *Miranda*, 975 F.2d at 1533

("Although job titles are entitled to some weight in this evaluation, 'the controlling

factor under the Equal Pay Act is job content'—the actual duties that the respective

employees are called upon to perform." (citation omitted)). As for Haeberlin's

additional experience and education, the EPA requires equal pay for equal work so

his alleged superlative qualifications are largely beside the point. *See id.* ("In Equal Pay Act cases, we compare the jobs, not the individual employees holding those jobs . . . [so] prior experience is not relevant to the 'substantially similar' inquiry." (quotation and citation omitted)).

The undersigned thus concludes that Haeberlin's EPA claim as alleged in the FAC fails as a matter of law. Although the proposed SAC augments the FAC by further alleging that Defendants paid female employees "more than [Haeberlin] *for the same work*," (SAC ¶ 53 (emphasis added)), this addition is nothing more than a "formulaic recitation" that cannot save his claim. *See Arafat*, 549 F. App'x at 875. Accordingly, the undersigned **RECOMMENDS** that Haeberlin's EPA claim be **DISMISSED**, and that Plaintiffs' Motion to Amend be **DENIED** as futile with respect to the claim.

### C. Section 1983 (Counts IV & V)

Finally, Plaintiffs have asserted race-discrimination claims against the City and Holmes under Section 1983, predicated on violations of 42 U.S.C. § 1981 ("Section 1981")[5] and the Equal Protection Clause.[6] Section 1983 creates a private

---

[5] Like Title VII, Section 1981 protects individuals against racial discrimination. *See* 42 U.S.C. § 1981; *Webster v. Fulton Cnty.*, 283 F.3d 1254, 1256 (11th Cir. 2002). Section 1983 is the exclusive federal remedy against state actors for violations of Section 1981. *Bryant v. Jones*, 575 F.3d 1281, 1288 n.1 (11th Cir. 2009).

[6] The Equal Protection Clause of the Fourteenth Amendment prohibits race discrimination in public employment. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018).

cause of action against any person who, under color of state law, deprives an individual of federal rights. 42 U.S.C. § 1983. Section 1983 is not itself a source of substantive rights, but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). For example, a plaintiff may bring Section 1983 claims for violations of her rights established under Section 1981, *see Butts v. Cnty. of Volusia*, 222 F.3d 891, 893, 894 (11th Cir. 2000), or the Equal Protection Clause, *see Arrington v. Cobb Cnty.*, 139 F.3d 865, 872 (11th Cir. 1998). Notably, "'Title VII and [Section] 1983 claims have the same elements where the claims are based on the same set of facts,' and in such cases, the claims are subject to the same legal analysis." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016); *accord Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) ("[W]hen, as here, a plaintiff attempts to use Title VII and 42 U.S.C. § 1983 as parallel remedies for the same allegedly unlawful employment discrimination, the elements of the two causes of action are identical.").[7]

When a plaintiff brings Section 1983 claims against an individual defendant,

---

[7] The undersigned recognizes that, although the same legal framework is generally used to analyze employment-discrimination claims under Title VII and Section 1983, a plaintiff can succeed on her Title VII claim by proving that race was a "motivating factor" in the adverse employment action, while a Section 1983 claim based upon a Section 1981 violation requires more—to prevail on a claim that the defendant violated Section 1981, "a plaintiff must initially plead and ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S.Ct. 1009, 1019 (2020). The distinction, however, is immaterial to this case given the discussion that follows.

the defendant can be liable in her individual capacity *only* if she is a final decisionmaker. *See Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1326 (11th Cir. 2003) (explaining that a "decisionmaker" has the power to make official decisions and may therefore be held individually liable under Section 1983). In other words, Section 1983 does not extend liability to supervisory officials based on a theory of respondeat superior or vicarious liability. *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1047 (11th Cir. 2014). To state an individual-capacity claim under Section 1983, then, a plaintiff must allege that the defendant personally participated in the unlawful conduct or otherwise caused the alleged deprivation. *Id.* at 1047–48. In contrast to individual-capacity suits as just discussed, "when an officer is sued under Section 1983 in his or her official capacity, the suit is simply 'another way of pleading an action against an entity of which an officer is an agent.'" *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (footnote and citation omitted). Such suits are therefore, "in actuality, suits directly against the city that the officer represents." *Id.*

A local government entity, in turn, can be held liable under Section 1983 *only* if the plaintiff is able to show that the entity *itself* caused the violation at issue. *Skop v. City of Atlanta*, 485 F.3d 1130, 1145 (11th Cir. 2007) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–94 (1978)). Accordingly, in order to state such a claim, a plaintiff must allege that the deprivation at issue resulted from the implementation of an unlawful policy, custom, or practice. *Sosa v. Martin Cnty.*, --

- F.4th ----, 2021 WL 4259153, at *15 (11th Cir. Sept. 20, 2021). An official local-government policy can be a decision by a municipality's lawmaking body, an act by a policymaking official, or a municipal custom—that is, a "practice[] so persistent and widespread as to practically have the force of law." *Id.* (citation omitted). This requirement is designed to "distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action *for which the municipality is actually responsible.*" *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 n.5 (11th Cir. 2003) (*en banc*).

### i. Claims against Holmes [8]

Plaintiffs' Section 1983 race-discrimination claims against Holmes in her individual capacity are premised upon the same allegations as their Title VII claims, *compare* (FAC Count I) *with* (*id.* Counts IV & V), and fall short for the same reasons. To briefly recap, principally owing to a lack of factual allegations concerning Holmes's decisionmaking motivations, Plaintiffs have failed to state a claim plausibly suggesting that they were unlawfully discriminated against. *See Quigg*, 814 F.3d at 1235; *Johnson*, 948 F.3d at 1325; *McQueen v. Ala. DOT*, 769 F. App'x 816, 824 (11th Cir. 2019) ("[B]ecause [plaintiff's Title VII] discrimination

---

[8] Plaintiffs do not explicitly assert individual and official-capacity claims against Holmes in the FAC, *see* (FAC Counts IV & V); however, in their opposition to Holmes's Motion to Dismiss and in the proposed SAC, they make clear that they are indeed asserting both types of claims, *see* (Doc. 16 at 9; SAC ¶¶ 57–80). Accordingly, both types will be evaluated.

and retaliation claims fail, his § 1983 claims asserted against the Individual Defendants based upon the same underlying facts must also fail.").

Regarding Plaintiffs' claims against Holmes in her official capacity, as just explained above, "when an officer is sued under Section 1983 in his or her official capacity, the suit is simply 'another way of pleading an action against an entity of which an officer is an agent.'" *Busby*, 931 F.2d at 776 (footnote and citation omitted). Because Plaintiffs have independently sued the City, their claims against Holmes in her official capacity are redundant and due to be dismissed. *See id.* ("To keep both the City and the officers sued in their official capacity as defendants in this case would have been redundant . . . .").

The proposed SAC, which combines Counts IV and V from the FAC into a single new Count IV and confirms that Plaintiffs are pursing individual and official-capacity claims against Holmes, does not include any substantive revisions to alter the preceding analysis. *See* (SAC Count IV). Therefore, because Plaintiffs have failed to state a claim against Holmes in her individual capacity, and their claims against Holmes in her official capacity are superfluous, the undersigned **RECOMMENDS** that their Section 1983 claims against Holmes be **DISMISSED**, and that their Motion to Amend be **DENIED** as futile with respect to same.

### ii. Claims against the City

As is the case with their Section 1983 race-discrimination claims against

Holmes, Plaintiffs' corresponding claims against the City are based on the same allegations as their Title VII claims. *Compare* (FAC Count I) *with* (*id.* Counts IV & V). For that reason, they too fail. *See Quigg*, 814 F.3d at 1235 (addressing plaintiff's Title VII and Section 1983 discrimination claims against local government entity together under the same legal analysis); *Johnson*, 948 F.3d at 1325 (same).

Plaintiffs fail to state a claim against the City for the further reason that, in order to hold a City liable under Section 1983, a plaintiff must allege that the municipality is itself responsible for the alleged deprivation through a policy or practice. *See Skop*, 485 F.3d at 1145; *Sosa*, --- F.4th ----, 2021 WL 4259153, at *15. Plaintiffs' FAC makes no policy or practice allegations, *see* (FAC Counts IV & V), while their proposed SAC purports to remedy this omission but does so only in conclusory terms insufficient to plausibly suggest the City is liable, *see* (SAC ¶¶ 66–71). To illustrate, Plaintiffs allege in the SAC that the City "had a custom or policy that constituted deliberate indifference" to their constitutional rights; that the City exhibited a "persistent and widespread practice" of replacing white employees with black employees; that Plaintiffs were terminated pursuant to "an official policy, practice or custom;" and that, additionally or alternatively, Holmes, Letang, and Mitchell were policymaking officials who implemented discriminatory employment practices on the City's behalf. (*Id.*). These allegations, however, suffer from the same flaw as many others pleaded in this matter—they are simply "naked assertions"

that lack factual enhancement. *See Iqbal*, 556 U.S. at 678.

Plaintiffs' Section 1983 claims against the City are redundant with their failed Title VII claims; moreover, the FAC and SAC each lack the factual allegations necessary to hold the City responsible for any alleged race-discrimination. For these reasons, the undersigned **RECOMMENDS** that Plaintiffs' Section 1983 claims against the City be **DISMISSED**, and that their Motion to Amend be **DENIED** as futile with respect to these claims.

## IV. CONCLUSION

For the reasons stated above, the undersigned:

1. **ORDERS** that Defendants' Motion to Strike, (Doc. 17), be **GRANTED**, and that Doc. 15 be stricken from the docket;

2. **RECOMMENDS** that Defendants' separate Motions to Dismiss, (Docs. 10, 11), each be **GRANTED**, and that all of Plaintiffs' claims be **DISMISSED WITH PREJUDICE**; and

3. **RECOMMENDS** that Plaintiffs' Motion to Amend, (Doc. 20), be **DENIED** as futile.

The Clerk is **DIRECTED** to terminate the reference to the undersigned Magistrate Judge.

IT IS SO **ORDERED AND RECOMMENDED** on this 12th day of October 2021.

_____
REGINA D. CANNON
United States Magistrate Judge